PUBLISHED

# VIRGINIA:

*In the Court of Appeals of Virginia on* **Friday** *the* **20th** *day of* **December, 2013**.

Johnathan Christopher Montgomery,                                        Petitioner,

 against             Record No. 2300-12-1

Commonwealth of Virginia,                                        Respondent.

Upon a Petition for a Writ of Actual Innocence

Before Judges Humphreys, Alston, and Chafin

Jon M. Talotta (Erica Knievel Songer; Marques P. Richeson; Adam D. Aft; Shawn Armbrust; Parisa Dehghani-Tafti; Hogan Lovells US LLP; Mid-Atlantic Innocence Project, on briefs), for petitioner.

Kenneth T. Cuccinelli, II, Attorney General (Alice T. Armstrong, Assistant Attorney General II, on briefs), for respondent.

Johnathan Christopher Montgomery ("Montgomery") petitions this Court to grant a writ of actual innocence based on non-biological evidence pursuant to Code §§ 19.2-327.10 through 19.2-327.14. Montgomery seeks to vacate his 2009 convictions for forcible sodomy, aggravated sexual battery, and animate object sexual penetration. In support of his petition, Montgomery proffers newly-discovered evidence—the recantation and subsequent perjury conviction of the complaining witness Elizabeth P. Coast ("Coast"). The Commonwealth agrees that Montgomery has satisfied the statutory requirements and joins Montgomery in asking this Court to grant his petition.

I. BACKGROUND

A. Montgomery's Conviction

In October of 2007, Coast, then seventeen, reported that when she was ten years old a neighborhood boy named "Jon" sexually assaulted her while the two were alone in her grandmother's backyard. The City of Hampton Police Department quickly identified "Jon" as Montgomery. In 2000, fourteen-year-old

Montgomery was living in Hampton, Virginia, in the house Coast identified as her assailant's. Montgomery attended Hampton High School from September 5, 2000 to December 15, 2000, but by January 2001, he had moved to Iowa. Coast identified Montgomery in a photo lineup using his Hampton High School yearbook photo. On October 15, 2007, the police arrested Montgomery for assaulting Coast on or around January 12, 2001. After the police discovered that Montgomery was not in Virginia at that time, it issued a new warrant alleging the incident happened between September 5, 2000 and December 15, 2000.

On June 23, 2008, the Circuit Court of the City of Hampton (the "trial court") tried and convicted Montgomery in a one-day bench trial for the assault of Coast. Coast testified under oath that Montgomery had sexually assaulted her in 2000. She described the alleged assault in graphic detail. She said that she did not tell anyone what happened at the time of the assault because she thought her parents "would get mad" and she was "really embarrassed." She explained that she decided to come forward seven years later because she thought she saw Montgomery at Wal-Mart.

Coast's cousin and "best friend," Emily, who played in the neighborhood with Coast and Montgomery, also testified. Emily said that she was "very uncomfortable" when Montgomery "tickled [Coast] and grabbed her stomach." However, Coast never told Emily that Montgomery ever hurt her.

Montgomery testified on his own behalf. He admitted that he tickled Coast, but never touched her inappropriately. Several character witnesses testified that in the many years they have known Montgomery, he is known for peacefulness and is "as honest as anybody can be now a days."

Besides Coast, no other witnesses to the incident testified at Montgomery's trial. Neither was any corroborating physical evidence that an assault occurred ever presented. The trial judge categorized this case as a "word against word situation." In reaching his verdict, the trial judge concluded that Coast was more credible then Montgomery because she had "no motive whatsoever" to lie. The trial court then found Montgomery guilty of forcible sodomy, aggravated sexual battery, and object sexual penetration. On April 10, 2009, the trial judge sentenced Montgomery to 45 years in prison, with 37 years and 6 months suspended.

-2-

### B. Coast's Recantation

Almost four years later, on October 30, 2012, Coast called her friend and colleague, Hampton Police Officer Jim Auer ("Auer"). She and Auer became friends when Coast began working for the City of Hampton Police Department three years earlier. Coast told Auer that "she had ruined a man's life." On November 1, 2012, Coast voluntarily made a videotaped statement at the Hampton Police Department. After consulting with counsel and receiving Miranda warnings, Coast recounted how she had falsely testified that Montgomery had assaulted her.

Coast explained that immediately before she accused Montgomery, her mother caught her looking at "sex stories" on the Internet. Out of fear of her mother, Coast said that she was looking at inappropriate material because she had been molested when she was ten years old. After she reluctantly named Montgomery as her attacker, the lie snowballed. Coast felt like she could not admit that the assault never happened. After recounting the story she testified to at Montgomery's trial, Coast told the police "[n]othing happened" between her and Montgomery. She admitted that she never had any sexual encounters with Montgomery.

Coast confessed to lying under oath at Montgomery's trial knowing that she faced criminal charges. She also knew that she would lose her job with the Hampton Police Department. On November 9, 2012, Coast was arrested for perjury and immediately fired from her job.

### C. Montgomery's Conditional Pardon and Petition for Writ of Actual Innocence

On November 19, 2012, Montgomery, through counsel, requested that Governor Robert McDonnell grant "a conditional pardon, releasing him during the period in which he files a Writ of Actual Innocence for Nonbiological Evidence with the Virginia Court of Appeals, and obtains an order granting his Writ." The Governor granted the conditional pardon with the terms requested by Montgomery on November 20, 2012, and Montgomery was immediately released from prison.

Montgomery's pardon was subject to several specific conditions: (1) Montgomery must file a petition for a writ of actual innocence with this Court within 30 days of his release, and (2) the Virginia Department

-3-

of Corrections must continue to supervise Montgomery during the period of conditional clemency. If Montgomery violates any of the conditions of the pardon, engages in "any criminal activity of any nature whatsoever" during the period of conditional clemency, *or* this Court denies his petition, then he "shall forfeit all privileges provided under this grant of clemency and, in [the Governor's] discretion, shall be subject to immediate arrest and incarceration to complete the term of his original sentence." Alternatively, if this Court grants his petition, then "[u]pon issuance of a writ of actual innocence, all of the foregoing conditions" "are immediately released" and a full pardon granted.

On December 20, 2012, Montgomery filed a petition with this Court for a writ of actual innocence based on non-biological evidence. The basis for his petition was Coast's voluntary recantation and the fact that her testimony was the only evidence supporting his conviction. On March 15, 2013, this Court granted the parties' joint motion of March 11, 2013 to stay further proceedings on Montgomery's petition pending the resolution of Coast's pending perjury charge.

### D. Coast's Perjury Conviction

On May 21, 2013, Coast pled guilty to perjury pursuant to Code § 18.2-434 for knowingly and intentionally giving false testimony at Montgomery's June 23, 2008 trial. Coast offered no defense against the perjury charge. At her sentencing hearing, Coast testified under oath that she randomly named Montgomery because she thought that because he had moved away, the police would never find him. Confirming her November 1, 2012 taped confession, Coast reiterated that Montgomery never assaulted her. At the time of the incident and the trial that followed, Coast did not feel she could admit she lied because everyone in her life believed her story. She continued the lie for years, not only because of the looming possibility of incarceration, but more so out of fear of what her family would think. Coast explained that she finally decided to confess and face criminal charges because "[she] couldn't handle the effects of the lie [she] had in [her] life, and it was—[she] decided to become very serious about [her] faith, and [she] thought that if [she] had the lie in [her] life, [she] couldn't pursue God . . . [a]nd also to get Jonathan out because he didn't deserve to be there at all." In a statement addressed to Montgomery at her sentencing hearing, Coast said:

-4-

"All I can say to you is how very sorry I am for the lie that I told which caused you to be sent to prison, four years of silence, and the years of silence that kept you there. . . . I'm ashamed of my [cowardice]."

On August 19, 2013, the circuit court sentenced Coast to five years in prison, with four years and ten months suspended, and ordered her to pay $90,000 restitution.

## II. ANALYSIS

### A. Constitutional Considerations

It is intuitively obvious that it would be impermissible for this Court to condition the outcome of a petition for a writ of actual innocence on the grant of a full pardon from the Governor. Nevertheless, we cannot proceed with the disposition of this petition without definitively answering the question of whether the opposite is true.

Therefore, and despite the fact that the parties are in agreement regarding their desired outcome, before turning to the merits of Montgomery's petition, we must first address the unusual and, as it develops, rather complex issue surrounding the fact that this petition arises as a condition prerequisite to the grant of a gubernatorial pardon.[1] According to the conditions of the pardon, if this Court denies Montgomery's petition for a writ of actual innocence then the conditional pardon is void and Montgomery must immediately return to prison. Alternatively, if this Court grants Montgomery's petition, then all of the conditions "release" upon the issuance of a writ of actual innocence and a full pardon becomes effective. We must analyze both the effect on a pardon of a condition that requires the issuance of a writ of actual innocence as well as the constitutionality of the participation of the judiciary in the executive clemency process.

The Constitution of the Commonwealth of Virginia declares certain fundamental powers in each of the three branches of the Commonwealth's government. Moreau v. Fuller, 276 Va. 127, 136, 661 S.E.2d 841,

___

[1] Neither party raised this point on brief. The Court raised it *sua sponte* at oral argument and invited the parties to address it in supplemental pleadings. Neither has done so. This Court may determine *sua sponte* whether the Constitution prohibits it from rendering a decision in a particular case. See, e.g., Charlottesville Area Fitness Club Operators Ass'n v. Albemarle Cnty. Bd. of Supervisors, 285 Va. 87, 99-100, 737 S.E.2d 1, 7 (2013) ("This Court will consider, *sua sponte*, whether a decision would be an advisory opinion because we do not have the power to render a judgment that is only advisory." (citing Martin v. Ziherl, 269 Va. 35, 40, 607 S.E.2d 367, 369 (2005))).

-5-

846 (2008). Article III, § 1 guarantees the separation of these powers—the "legislative, executive, and judicial departments shall be separate and distinct, so that none exercise the powers properly belonging to the others, nor any person exercise the power of more than one of them at the same time." Va. Const. art. III § 1. "At the heart of this declaration and separation of powers are roles that are uniquely allocated to the identified departments of government." Moreau, 276 Va. at 136, 661 S.E.2d at 846. As the chief executive, the Governor has the exclusive constitutional authority to pardon or commute sentences after conviction. Va. Const. art. V § 12; Code § 53.1-299; Taylor v. Commonwealth, 58 Va. App. 435, 443, 710 S.E.2d 518, 522 (2011). "The Virginia judiciary 'may not assume a power of clemency or pardon which is a unique function of executive power.'" Taylor, 58 Va. App. at 443, 710 S.E.2d at 522 (quoting Moreau, 276 Va. at 136, 661 S.E.2d at 846).

In interpreting the application of Article III, § 1, "the Supreme Court of Virginia has adopted the 'whole power' doctrine in reviewing an alleged violation of the separation of powers." Tross v. Commonwealth, 21 Va. App. 362, 378, 464 S.E.2d 523, 530 (1995); see also In re Phillips, 265 Va. 81, 86, 574 S.E.2d 270, 273 (2003). While this Court recognizes that the three branches should be "as separate and distinct from each other as practicable," logistically, no government could operate if an absolute and unqualified adherence was enforced. Id. at 86-87, 574 S.E.2d at 273. Therefore, "'the whole power of one of these departments should not be exercised by the same hands which possess the whole power of either of the other departments, but [] either department may exercise the powers of another to a limited extent.'" Id. (quoting Winchester & Strasburg R.R. Co. v. Commonwealth, 106 Va. 264, 270, 55 S.E. 692, 694 (1906)); accord Baliles v. Mazur, 224 Va. 462, 472, 297 S.E.2d 695, 700 (1982) (stating that the "true meaning" of separation of powers is that the whole power of one department should not be exercised by the same hands possessing the whole power of another department (citing Winchester & Strasburg R.R. Co., 106 Va. at 270, 55 S.E. at 694)). Simply put, Article III, § 1 forbids the judiciary from exercising a "whole power" exclusively reserved for either the executive or legislative branch of government.

Our Supreme Court has previously addressed the issue of when delegating a "whole power" of the Governor to the judiciary might offend Article III, § 1. In Phillips, Code § 53.1-231.2 was challenged as being unconstitutional because it allegedly assigned the circuit court a function exclusively vested in the executive branch. 265 Va. at 84-85, 574 S.E.2d at 272. Code § 53.1-231.2 allows persons convicted of a non-violent felony to petition the circuit court for approval of a request to seek the restoration of their voting rights, while Article V, § 12 grants the Governor exclusive authority to remove political disabilities resulting from a felony conviction. Code § 53.1-231.2; Va. Const. art. V § 12.

The Supreme Court concluded that the statute does not authorize a circuit court to exercise the "whole power" vested in the Governor. Phillips, 265 Va. at 87, 574 S.E.2d at 273. Rather, the circuit court's function under the statute is limited to determining whether a petitioner presented sufficient evidence supporting the specified statutory criteria that identifies felons who may *qualify* for the restoration of their eligibility to vote. Id. Moreover and significantly, the statute does not require that a court render what would amount to an advisory opinion as to whether the Governor should remove the convicted felon's political disabilities. Id. Importantly, the circuit court "does not exercise any function that would restrict the power of the Governor." Id. Felons are not required to file a petition with the circuit court before seeking relief from the Governor, nor does the denial of the petition by the circuit court affect a felon's right to apply directly to the Governor. Id. Thus, regardless of whether a felon petitioned the circuit court or applied directly to the Governor, "the power to remove the felon's political disabilities remains vested solely in the Governor, who may grant or deny any request without explanation, and there is no right of appeal from [his] decision." Id. at 87-88, 574 S.E.2d at 273. The Supreme Court held that Code § 53.1-231.2 did not unlawfully assign the judicial branch a function reserved to the Governor by the Constitution. Id. at 88, 574 S.E.2d at 273.

We therefore must determine whether the conditional pardon issued to Montgomery requires this Court to exercise the "whole power" granted to the Governor to pardon Montgomery. Resolving this issue requires this Court first to determine under what circumstances one branch of government exercises a "whole power" of another branch rather than only exercising it "to a limited extent." Id. The common determinative

-7-

factor is whether the governmental branch constitutionally vested with authority retains the final decision-making power.  See, e.g., id. (finding Code § 53.1-231.2 is constitutional because the power to remove a felon's political disabilities "remains vested solely in the Governor" irrespective of the circuit court's ruling); Roach v. Commonwealth, 251 Va. 324, 338, 468 S.E.2d 98, 106 (1996) (overruled on other grounds) (concluding that "[b]ecause [intake] officers exercise only a limited judicial function, and the juvenile and domestic relations district court *retains actual control* over the juveniles . . . the intake officer's authority to issue criminal petitions does not violate the separation of powers guaranteed by the Virginia Constitution") (emphasis added); Tross, 21 Va. App. at 378-79, 464 S.E.2d at 531 ("[W]hile there is some overlap of executive and judicial functions, juvenile intake officers do not exercise the "whole power" of the judiciary[,] . . . the juvenile and domestic relations district court judges *control the actual disposition* of juveniles before the court." (emphasis added)); Akbar v. Commonwealth, No. 0915-09-3 (Va. Ct. App. Apr. 27, 2010) (because the trial court "*retain[ed] the ability* to assess punishment against the defendant," the statute did not authorize the executive branch to exercise the "whole power" of the judiciary to impose a term of punishment) (emphasis added).  Clearly, the judiciary has the constitutional authority to adjudicate criminal matters, and equally clearly, this Court has the statutory authority to vacate the conviction of someone who demonstrates their actual innocence.  Unquestionably, the Governor has the constitutional authority to grant full or conditional pardons—subject only to constitutional constraints.  The constitutional question is whether these otherwise separate but similar roles have been improperly consolidated.[2]

---

[2] Contrary to the suggestion at oral argument by counsel for Montgomery, the Governor does not suffer an inferior status to that of the courts or the legislature in granting governmental grace to achieve the ends of justice.  In fact, flowing as it does from constitutional and common law principles, the executive department of government historically has primacy in this area.  See e.g., 4 William Blackstone, Commentaries *397 ("[The king's] power of pardoning was said by our Saxon ancestors" and "no other person has the power to pardon or remit any treason or felonies whatsoever; but that the king has the whole and sole power thereof").  Similar to the legal effect of securing a writ of actual innocence from this Court, it is an ancient common law principle that a full and unconditional pardon—as opposed to other lesser forms of clemency—blots out both the legal existence of a conviction or crime and any resulting guilt or infamy.  See Carlisle v. United States, 83 U.S. 147, 151 (1872) ("All have agreed that the pardon not merely releases the offender from the punishment prescribed for the offen[s]e but that it obliterates in legal contemplation the offen[s]e itself.").  Moreover, whether expressly stated in a pardon warrant or not, the Governor traditionally

-8-

Therefore, our ability to act upon the merits of Montgomery's petition turns on whether it was constitutionally proper for the Governor to honor Montgomery's request to condition a pardon on the issuance of a writ of actual innocence by this Court. The plain terms of the pardon allow for three possible outcomes. Montgomery could violate one of the other conditions of the pardon before this Court resolves his petition, or this Court could deny his petition. Both circumstances effectively vacate the conditional pardon. Alternatively, this Court could issue a writ of actual innocence, which would immediately "release" the other conditions of the pardon. If this Court grants Montgomery's petition, his convictions are vacated and expunged. See Code § 19.2-327.13. Thus, if this Court grants Montgomery's petition and issues a writ of actual innocence, the pardon is ineffective and moot from that moment because the conviction would no longer exist and there would be nothing for the Governor to pardon.[3] Consequently, by conditioning his pardon on the issuance of a writ of actual innocence, the Governor has not retained the final power to pardon Montgomery.[4]

While our Supreme Court has long held that the Governor possesses the constitutional power to attach conditions to pardons, "the condition annexed to the pardon must not be . . . illegal." Lee v. Murphy, 63 Va.

_____

determines an individual's innocence or rehabilitation when deciding whether to grant a full pardon by using a pardon-deliberation process that is quasi-judicial in nature, much like an appellate court's review of a trial court's record for error.

[3] During oral argument, the Attorney General agreed that in the abstract the grant of a full pardon would make unnecessary a writ of actual innocence, and conversely, granting a writ of actual innocence would obviate the need for the Governor to grant a pardon.

[4] Alternatively, if one could conjure some metaphysical construction of the law that permits a fully complete pardon to coexist simultaneously with a writ of actual innocence, the vitality of the pardon would render a writ in this case ephemeral because a full pardon coming into existence simultaneously with the issuance of the writ would render the writ moot before the ink on it was dry. This would effectively transform our judgment into little more than an advisory opinion to the Governor that Montgomery is worthy of executive clemency. See Charlottesville Area Fitness Club Operators Ass'n, 285 Va. at 99-100, 102, 737 S.E.2d at 7, 9 (stating that "when courts lack the power to bind all parties to the controversy, opinions are merely advisory" and the Court does "not have the power to render a judgment that is only advisory"); see, e.g., Phillips, 265 Va. at 87, 574 S.E.2d at 273 (concluding that "[t]he court's order did not constitute the rendering of an advisory opinion because the order adjudicates only the issue of the sufficiency of the evidence in support of the statutory criteria and does not state an opinion whether the Governor should remove the convicted felon's political disabilities").

-9-

789, 802-03 (1872); accord Wilborn v. Saunders, 170 Va. 153, 159, 195 S.E. 723, 725 (1938). The Governor may not transfer or delegate his constitutional authority to pardon to another department of government nor does the judiciary have any proper constitutional role in a decision to grant executive clemency. Because it effectively transfers the final decision regarding clemency for Montgomery from the Governor to this Court, we therefore conclude that in this case, the condition of Montgomery's pardon requiring that he receive a writ of actual innocence from this Court is a condition that delegates the chief executive's "whole [clemency] power" to the judiciary thereby transgressing the constitutional constraints of Article III, § 1. See Phillips, 265 Va. at 86, 574 S.E.2d at 273 ("[I]f any statute purporting to confer jurisdiction on the courts impermissibly invades the powers of the Governor granted by the Constitution, that legislation is subject to a constitutional challenge. . . .").

We now turn to the task of ascertaining the effect invalidating this condition has on our ability to consider the merits of Montgomery's petition. Our Supreme Court has held that if a condition annexed to a pardon is contrary to law, in such case the condition is void and the pardon is absolute. See Rives v. Farish's Adm'r, 65 Va. 125, 133 (1873). In that event and as already noted, Montgomery's petition would be unnecessary because he would already stand exonerated by the gubernatorial pardon and there would no longer be convictions in existence to vacate. We then would be required to dismiss Montgomery's petition as moot. See Hallmark v. Pers. Agency, Inc. v. Jones, 207 Va. 968, 971, 154 S.E.2d 5, 7 (1967) (stating that "appellate courts do not sit to give opinions on moot questions").

However, in this case the pardon contains additional conditions requiring Montgomery to refrain from criminal activity and remain under parole supervision pending the outcome of Montgomery's petition to this Court. These additional conditions are not constitutionally infirm. Nevertheless, in the absence of the now invalid condition, and contrary to the clear intent of the Governor, the pardon contains no other mechanism to terminate the remaining conditions—meaning that the pardon will continue to be conditional indefinitely and will never finally resolve the issue of Montgomery's exoneration of these offenses. Therefore, as distinguished from other cases previously considered by our Supreme Court, the invalidation of the condition

-10-

that Montgomery obtain a writ of actual innocence does not convert his conditional pardon to an absolute pardon that would render any further action by this Court on Montgomery's petition unnecessary.

This holding relieves any further constitutional concerns that might prevent this Court from resolving the merits of Montgomery's petition. Our judgment that this Court may not properly participate in the clemency process does not neuter this Court's authority to act upon Montgomery's petition because we independently have original jurisdiction under Code § 19.2-327.10 to consider a petition for a writ of actual innocence based on non-biological evidence. See Carpitcher v. Commonwealth, 273 Va. 335, 342, 641 S.E.2d 486, 490 (2007) (citing Code § 19.2-327.10). We therefore conclude that we can properly address the merits of Montgomery's petition pursuant to this Court's separate statutory grant of authority.

B. Merits of Montgomery's Petition for a Writ of Actual Innocence

Under Code § 19.2-327.11(A) a petition for a writ of actual innocence based on non-biological evidence must allege "categorically and with specificity":

> (i) the crime for which the petitioner was convicted or the offense for which the petitioner was adjudicated delinquent, and that such conviction or adjudication of delinquency was upon a plea of not guilty;
>
> (ii) that the petitioner is actually innocent of the crime for which he was convicted or the offense for which he was adjudicated delinquent;
>
> (iii) an exact description of the previously unknown or unavailable evidence supporting the allegation of innocence;
>
> (iv) that such evidence was previously unknown or unavailable to the petitioner or his trial attorney of record at the time the conviction or adjudication of delinquency became final in the circuit court;
>
> (v) the date the previously unknown or unavailable evidence became known or available to the petitioner, and the circumstances under which it was discovered;
>
> (vi) that the previously unknown or unavailable evidence is such as could not, by the exercise of diligence, have been discovered or obtained before the expiration of 21 days following entry of the final order of conviction or adjudication of delinquency by the circuit court;
>
> (vii) the previously unknown or unavailable evidence is material and, when considered with all of the other evidence in the current record, will prove that

-11-

no rational trier of fact would have found proof of guilt or delinquency beyond a reasonable doubt; and

(viii) the previously unknown or unavailable evidence is not merely cumulative, corroborative or collateral.

Code § 19.2-327.11(A)(i)-(viii). This Court may grant the petition "upon a finding that the petitioner has proven by clear and convincing evidence all of the allegations contained in clauses (iv) through (viii) of subsection A of Code § 19.2-327.11, and upon a finding that no rational trier of fact could have found proof of guilt or delinquency beyond a reasonable doubt."[5] Code § 19.2-327.13. In other words, to obtain a writ of actual innocence Montgomery must prove by clear and convincing evidence that the newly-discovered evidence: (1) was previously unknown or unavailable to him or his attorney at the time the conviction became final in the circuit court; (2) could not have been discovered through due diligence before the expiration of the 21 days following the entry of the final order of conviction; (3) (a) is material, and (b) when considered with all of the other evidence in the record, proves that no rational trier of fact could have found proof of guilt beyond a reasonable doubt; and (4) is not merely cumulative, corroborative, or collateral. See Moore v. Commonwealth, 53 Va. App. 334, 343-44, 671 S.E.2d 429, 434 (2009) (quoting Carpitcher, 273 Va. at 343-44, 641 S.E.2d at 491).

The newly-discovered evidence that Montgomery proffers in support of his petition for a writ of actual innocence is the recantation of Coast and her resulting perjury conviction. It is apparent from the record—and the Commonwealth concedes—that Montgomery can prove by clear and convincing evidence elements (1), (2), and (4). Evidence of Coast's recantation was both unknown and unavailable to Montgomery at the time his conviction was final, and he could not have discovered it through due diligence

---

[5] Effective July 1, 2013, the General Assembly amended Code § 19.2-327.13 to read, "no rational tier of fact *would* have found proof of guilt beyond a reasonable doubt" instead of "no rational tier of fact *could* have found proof of guilt beyond a reasonable doubt." Because Montgomery filed his petition before the amended statute was effective, and there is no indication of a legislative intent to apply the amendment retroactively, the language of the statute in effect at the time Montgomery filed his petition applies. See Taylor v. Commonwealth, 44 Va. App. 179, 184, 604 S.E.2d 103, 105 (2004).

-12-

within 21 days of the entry of the final order. Evidence of Coast's recantation is not cumulative, corroborative, or collateral to evidence presented at Montgomery's trial.

The third element, the materiality of Coast's recantation, was the only element initially contested in this case. In its answer the Commonwealth requested that this Court either (1) certify the question of the credibility of Coast's recantation to the circuit court before resolving the merits of Montgomery's petition for a writ of actual innocence; or alternatively, (2) stay Montgomery's petition proceedings pending the resolution of Coast's perjury charge. The Commonwealth asserted that if Coast is convicted of perjury, the conviction would be clear and convincing evidence that Coast's trial testimony was false. After this Court granted the parties' joint motion to stay the proceedings and Coast pled guilty, the parties filed supplemental briefing addressing the impact of Coast's perjury conviction on the petitioner's burden of proof under Code § 19.2-327.11(A)(ii). In light of Coast's perjury conviction, the Commonwealth now concedes that the materiality requirement is satisfied, and considering the entire record, no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

To satisfy Code § 19.2-327.11(A)(vii) the petitioner must prove by clear and convincing evidence that the newly-discovered evidence is (a) is material, *and* (b) when considered with all of the other evidence in the record, proves that no rational trier of fact could have found proof of guilt beyond a reasonable doubt. Carpitcher, 273 Va. at 347, 641 S.E.2d at 493. The petitioner's burden of proof under Code § 19.2-327.11(A)(vii) in cases involving a victim's recantation is well settled. For recantation evidence to be "material," the recantation "must be *true*." Carpitcher, 273 Va. at 345, 641 S.E.2d at 492 (emphasis added); Haas v. Commonwealth, 283 Va. 284, 295, 721 S.E.2d 479, 484 (2012) ("[The Petitioner] ha[s] the burden of proving to the Court of Appeals, by clear and convincing evidence, that the [victim]'s recantations are true.").[6] In Carpitcher, the Supreme Court held that the petitioner had not met his burden because the trial

---

[6] Requiring "material" evidence to be "true" is consistent with the statute's legislative purpose. Carpitcher, 273 Va. at 345, 641 S.E.2d at 492. By enacting the statute the General Assembly "intended to provide relief only to those individuals who can establish that they did not, as a matter of fact, commit the crimes for which they were convicted," and did "not intend to provide relief to individuals who merely produced evidence contrary to the evidence presented at their criminal trial." Id.

court was unable to tell whether the victim's trial testimony or recantation was true. 273 Va. at 346, 641 S.E.2d at 493. Consequently, newly-discovered evidence that the victim recanted her original testimony could not be "material" if all it proved was that the victim had testified falsely on one of the two occasions—but not which one. Id.

Carpitcher highlights the major problem with considering a victim's recantation as the sole basis for granting a writ of actual innocence. Because "recantation evidence is generally questionable in character and is widely viewed by the courts with suspicion because of the obvious opportunities and temptations for fraud," "[u]nless proven true, recantation evidence merely amounts to an attack on witness credibility by the witness herself." Id. at 346, 641 S.E.2d at 492. There is widespread judicial skepticism of victim recantations, particularly in cases involving child abuse "'where recantation is a reoccurring phenomenon.'" Haas, 283 Va. at 292, 721 S.E.2d at 482 (quoting United States v. Provost, 969 F.2d 617, 621 (8th Cir. 1992)). "Such skepticism increases with the passage of time. . . . [m]emories may have faded, witnesses may have disappeared or become incapable of testifying, physical evidence may be unrecoverable and the recanting witness may have had ample time to acquire an extraneous motive to falsify his original testimony." Id.

Because victims' recantations are often unreliable, it is rare that a petitioner can offer clear and convincing evidence that the recantation is true and it is the trial testimony that is false. See, e.g., Haas, 283 Va. at 295, 721 S.E.2d at 483-84 (affirming the dismissal of petition for a writ of actual innocence based on non-biological evidence because the petitioner failed to carry his burden of proof that the victims' recantations were true because their trial testimony was corroborated by other evidence); Moore, 53 Va. App. at 346-47, 671 S.E.2d at 435-36 (finding that the petitioner failed to carry his burden of proof that the victim's recantation was true because the victim's trial testimony was corroborated by other evidence of guilt). However, in this case, Coast's perjury conviction presents an uncommon situation. It is obvious that Coast's recantation is "material" in the sense that it relates directly to the matter at issue, Montgomery's guilt or innocence. See Turner v. Commonwealth, 282 Va. 227, 250-51, 717 S.E.2d 111, 123 (2011) (finding that

-14-

a recantation must relate to the matter at issue in the case—the defendant's guilt or innocence—to be "material"). The only question is whether Montgomery has proved that Coast's recantation is "true." Unlike in Carpitcher, where the trial court could not determine which of the victim's statements were false, in this case, the entry of Coast's guilty plea serves as a judicial admission that her original testimony at Montgomery's trial was false and the verdict of the circuit court based upon that plea establishes that falsity *beyond a reasonable doubt*. Although a perjury conviction is not required to meet petitioner's burden of proving the recantation is true, it establishes with legal certainty that her trial testimony is false. Moreover, unlike in Moore and Hass, there is no evidence in the record that rebuts Coast's recantation by corroborating her trial testimony. Further, there are no facts suggesting that her unprompted recantation was in any way pressured, coerced, or is otherwise unreliable. Consequently, Coast's perjury conviction establishes clear and convincing evidence that her recantation is true and her trial testimony was perjured, and is therefore "material" to the issue of his actual innocence.

However, our analysis is still incomplete. Code § 19.2-327.11(A)(vii) requires that Montgomery meet a two-part statutory burden. Having proved that Coast's recantation is "material," he must also demonstrate that this newly-discovered evidence, considered with all the other evidence in the record, proves that no rational trier of fact could have found him guilty. See Carpitcher, 273 Va. at 347, 641 S.E.2d at 493 ("[T]o meet this statutory burden, Carpitcher was required to prove both that the recantation evidence was true and that, when considered with all the other evidence in the current record, no rational trier of fact could have found him guilty of the crimes.").

Before the trial judge announced his verdict, he acknowledged on the record that this case rested entirely on Coast's word against Montgomery's word.[7] Absent Coast's original testimony, the record contains no evidence of Montgomery's guilt. There are no witnesses who testified that the incident ever occurred. There is no physical evidence that a crime ever happened. The record is entirely devoid of any

---

[7] Although not dispositive, we also find it significant that following Coast's recantation of her trial testimony the trial judge who originally convicted Montgomery and provided the factual record currently before us expressed his personal regret and concern regarding the original verdict he rendered in this case.

-15-

evidence that incriminates Montgomery. In summary, the only evidence of Montgomery's guilt flows from testimony that has subsequently been adjudicated as perjured and no other evidence in the record supports a finding of guilt. We therefore conclude that Montgomery has met his statutory burden to establish by clear and convincing evidence all of the requirements contained in subsection A of Code § 19.2-327.11. Further, we find that had this information been known at the time of his trial, no rational trier of fact could have found Montgomery guilty beyond a reasonable doubt.

### III. CONCLUSION

We hold that Montgomery has met his burden under Code § 19.2-327.11(A) of establishing that he is actually innocent of the crimes for which he was convicted. Accordingly, pursuant to Code § 19.2-327.13 this Court grants Montgomery's petition and issues a writ of actual innocence based on non-biological evidence, thereby vacating his convictions for forcible sodomy, aggravated sexual battery, and animate object sexual penetration. If there is no appeal from this judgment to the Supreme Court, the clerk shall forward a copy of this writ to the trial court, where an order of expungement shall be immediately entered regarding these offenses.

This order shall be published.

A Copy,

Teste:

*original order signed by the Clerk of the*
*Court of Appeals of Virginia at the direction*
*of the Court*

Clerk

-16-